## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **TWO GENERAL ELECTRIC AIRCRAFT** | ) | |
| **ENGINES, WITH ENGINE SERIAL** | ) | |
| **NUMBERS 695244 AND 705112, AND ALL** | ) | |
| **RECORDS PERTAINING THERETO** | ) | |
| **Defendant.** | ) | |
| | ) | |

**COMES NOW**, the plaintiff United States of America, by and through the United States Attorney for the District of Columbia, to bring this verified complaint for forfeiture in a civil action *in rem* to condemn and forfeit against the defendant properties, which are two General Electric (GE) aircraft engines, engine serial numbers (ESN) 695244 and 705112, to the use and benefit of the United States in accordance with Supplemental Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules").  In further support of its cause, plaintiff states as follows:

### I.  NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.      This *in rem* forfeiture action arises out of an investigation by the Bureau of Industry & Security ("BIS"), Office of Export Enforcement ("OEE") of a scheme to illicitly procure sensitive products, items, and commodities from the United States, ultimately destined for Iran, for the purpose of evading U.S. export controls and sanctions.

2.      For the reasons set forth in more detail below, the United States seeks the seizure and forfeiture of the defendant properties.  The defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from

proceeds traceable to violations of a specified unlawful activity ("SUA"), including a violation of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, which is an SUA pursuant to 18 U.S.C. § 1956(c)(7)(D).  In addition, the defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions and/or attempted money laundering transactions, in violation of 18 U.S.C. § 1956, and/or as assets traceable to such property.  The defendant properties are also subject to seizure and forfeiture under the authority of the Secretary of Commerce, as codified in 22 U.S.C. § 401(a).

## II.    JURISDICTION AND VENUE

3.     This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.  Pursuant to 28 U.S.C. § 1355, the act of Congress giving rise to forfeiture is 18 U.S.C. § 981(a).

4.     Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia, and also pursuant to 28 U.S.C. § 1355(b)(2) because the property that is subject to forfeiture under the laws of the United States is located in a foreign country.  The assets are currently believed to be located in Antalya, Turkey.

5.     This civil action *in rem* for forfeiture is governed by 21 U.S.C. § 881, 18 U.S.C. § 983, the Federal Rules of Civil Procedure, and the Supplemental Rules, particularly Rule G.

### III.   STATUTORY AUTHORITIES

#### A.   The Export Administration Regulations

5.      The United States Department of Commerce ("Department of Commerce") has the authority to prohibit or curtail the export of goods and technologies from the United States to foreign countries in order to protect, among other things, the national security and foreign policy of the United States.   The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR" or "Regulations"), which restrict the export of certain goods and technologies unless authorized by the Department of Commerce through issuance of a valid export license by its Bureau of Industry and Security.   The EAR further prohibit any transaction designed to evade or avoid, or which has the purpose of evading or avoiding, said regulations, including the making of false or misleading statements or concealing a material fact in the course of the submission of documents relating to an export of goods or technologies.

6.      The EAR, 15 C.F.R. 730.1, *et seq*., regulate the export of all "dual use" items, that is, items that have both a commercial application and a military or strategic use.  *See* 15 C.F.R. § 730.3.  The EAR limit the export of goods and technology that could enhance foreign military capabilities, jeopardize U.S. national security, or undermine U.S. foreign policy goals.   The EAR place requirements on exporters and include a list of products, commodities, and items for which an export license is required.  *See* 15 C.F.R. § 744.

7.      Whether an item requires an export license depends, in part, on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for.   The EAR expressly require a license applicant to disclose the names and addresses of all parties to a transaction, 15 C.F.R. § 748.4(b), including the applicant, purchaser,

intermediate consignee(s) (if any), ultimate consignee, and end-user, 15 C.F.R. § 748.5. Certain

applications must be supported by documents designed to elicit information concerning the

disposition of the items intended for export. *See* 15 C.F.R. § 748.9(b).

8.      The EAR's authorizing statute, the Export Administration Act of 1979 ("EAA"),

codified at 50 U.S.C. App. 2401-2420, expired in August 1994, and was reauthorized by Public

Law 106-508, signed on November 13, 2000. The EAA lapsed again on August 20, 2001, but

the Regulations have continued in full force and effect through periodic reauthorizations and

successive invocations of the International Emergency Economic Powers Act ("IEEPA") (see

below). On August 17, 2001, President George W. Bush issued Executive Order ("EO") 13222,

in which he ordered that all provisions of the EAR "remain in full force and effect" under the

IEEPA authority. EO 13222 has been extended by successive Presidential Notices, the most

recent being that of August 7, 2014. *See* 79 Fed. Reg. 46959 (August 11, 2014).

9.      To violate, attempt to violate, or conspire to violate any portion of the EAR is a

felony punishable by up to 20 years imprisonment under IEEPA. *See* 50 U.S.C. § 1705. The

EAR makes it unlawful to engage in any conduct prohibited by, or contrary to, or to refrain from

engaging in any conduct required by, the EAR. It is also unlawful to violate any order, license or

authorization issued thereunder, and equally unlawful to cause, aid, abet, solicit, attempt, or

conspire to commit a violation of the EAR, or any order, license, or authorization issued

thereunder. The EAR prohibit the ordering, buying, removing, concealing, storing, use, sale,

loan, disposition, transfer, transport, financing, forwarding, or other servicing, in whole or in

part, of any item exported or to be exported from the United States, that is subject to the EAR,

with knowledge that a violation of the EAR, or any order, license, or authorization issued

thereunder, has occurred, is about to occur, or is intended to occur in connection with the item. *See* 15 C.F.R. § 764.2(a)-(e).

10.    Finally, pursuant to the EAR, it is unlawful to engage in any transaction or take any other action with intent to evade the provisions of the EAR, or any order, license, or authorization issued thereunder.  *Id*. § 764.2(h).

### B.    The International Emergency Economic Powers Act

11.    This civil forfeiture action relates to violations of the Regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*  The IEEPA gives the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder.  *See* 50 U.S.C. § 1705(a).

### C.    Title 18, United States Code, Section 554

12.    Additionally, 18 U.S.C. § 554 makes it unlawful to export or attempt to export or smuggle from the United States "any merchandise, article, or object contrary to any law or regulation of the United States . . . ."  Violations of the EAR and IEEPA serve as predicate acts for an 18 U.S.C. § 554 violation.

### D.    BIS Temporary Denial Orders

13.    A Temporary Denial Order (TDO) is an administrative order issued under the authorities of the EAR (15 C.F.R § 766.24) and signed by the Assistant Secretary of Commerce for Export Enforcement, "temporarily denying export privileges when such an order is necessary in the public interest to prevent the occurrence of an imminent violation."  15 C.F.R § 764.6(c).

14.     As defined in 15 C.F.R § 766.24, "a violation may be 'imminent' either in time or degree of likelihood."  To indicate the likelihood of future violations, BIS may show that the violations are ". . . significant, deliberate, covert and/or likely to occur again, rather than technical or negligent . . . ."  The TDO is a public document that provides notice to companies in the United States and abroad to "cease dealing with the [named respondents of the TDO] in U.S.-origin items . . . ."  15 C.F.R § 766.24(b)(3).

15.     A "related person" may be added to the TDO as well "in order to prevent evasion [of the TDO] . . . ."  15 C.F.R § 766.23(a).  The related person is not the respondent to the TDO, but the terms of the TDO are made applicable to them because they are "related to the respondent by ownership, control, position of responsibility, affiliation, or other connection in the conduct of the trade or business."  15 C.F.R § 766.23(a).

### E.     Iran Transactions and Sanctions Regulations ("ITSR")

16.     On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders.  In October 2012, the ITR was amended to become the Iran Transaction and Sanctions Regulations ("ITSR").  *See* 77 Fed. Reg. 64666 (Oct. 22, 2012).

17.     The ITSR generally prohibits any person from exporting or causing to be exported from the United States any goods or technology without having first obtained an export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.  The ITSR imposes, among others, the following prohibitions:

Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, or Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that the goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran.

Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

## IV.     PROBABLE CAUSE FOR FORFEITURE

### A.     Overview

18.     In or about February 2013, senior representatives of an Iranian airline company, which is subject to a TDO, confirmed the purchase of two GE aircraft engines that are the defendant properties in this action. Because of the Iranian company's inability to legitimately procure these engines, it orchestrated a convoluted transaction involving the two defendant properties plus an additional six engines. The additional six engines appear to be part of an otherwise legitimate transaction involving a customer in Russia.

19.     Rather than make payment directly for the defendant properties, the Iranian airline company used a Russian intermediary and at least three shell companies in different countries to send payments for the defendant properties to the unwitting U.S. seller ("Company A"). These three shell companies were based in the British Virgin Islands ("BVI"), Belize, and the United Kingdom.

20.     In or about October 2013, the BVI shell company entered into a contract with Company A for the defendant properties and the six other aircraft engines. The defendant properties were originally manufactured in the United States and had previously been exported to Turkey, where they were located at the time of the transaction. The additional six engines were shipped from various locations, including the United States.

21.     In late 2013, the U.S. Government became aware of the imminent transfer of the defendant properties to a party in Iran through Pouya Airlines, an Iranian cargo airline.

22.     On January 3, 2014, BIS issued a TDO naming 3K Aviation Consulting and Logistics ("3K"), its owner, Huseyin Engin Borluca, and Pouya Airlines (a/k/a Yas Air, f/k/a Pars Air) as Denied Parties. The TDO had the effect of blocking U.S. based entities from

engaging in transactions with the denied parties.  This TDO was issued, in part, in an attempt to halt the re-export of the defendant properties – two U.S.-origin GE civil aircraft engines (engine serial numbers ("ESNs") 695244 and 705112 respectively) – from Turkey to Iran.

23.     The defendant properties are engines manufactured in the United States.  They are classified as Export Control Classification Number ("ECCN") 9A991.d, and thus are subject to the EAR regardless of their location.  No U.S. Government authorization was obtained by any party to this transaction for the transfer of the defendant properties to Iran.  Such authorization is required by the EAR. The attempt to transfer the defendant properties without such authorization constitutes a violation of IEEPA, and therefore makes the defendant properties subject to forfeiture.

### B.    Purchase of the Defendant Properties by Company A

24.     The defendant properties were formerly owned and used by a Turkish airline.  In mid-2013, the defendant properties were sold to a Turkish intermediary, which, in turn, sold the properties to Company A in October 2013.

25.     On or about October 28, 2013, Company A entered into a contract to sell the defendant properties to a BVI shell company, Evans Meridians Ltd. ("Evans"), as part of a larger transaction involving six other engines.   On or about November 18 and 22, 2013, Company A invoiced Evans for the purchase of the defendant properties and the six other engines.  The invoices indicated that the defendant properties would be delivered to Evans in the British Virgin Islands.

26.     The invoices included specific language regarding the purchaser's obligations to comply with U.S. export laws.  Specifically, the invoices stated:

> It is the policy of [Company A] to ensure it compliances with the United States
> export control regulations for all sales of the U.S. products controlled by Export

Administration regulations.  As the product(s) you are purchasing may be exported and used outside of the United States, ALL PARTS BEING SUPPLIED ARE SUBJECT TO COMPLY WITH THE FOLLOWING EXPORT COMPLIANCE REGULATION.

(Emphasis in original.)  The invoice further stated: "1. Will not export or re-export U.S. products or software to Cuba, Iran, North Korea, Syria or Sudan - or to any restricted country unless otherwise authorized by the United States Government."

### C.     Payments Made by Evans for the Eight Engines

27.     Evans and the other shell companies paid a total of $12,975,090.91 for the eight engines, including the defendant properties.  Specifically, Evans made 18 wire transfers to Company A as partial payment for these eight engines, totaling $11,005,090.92, between October 25, 2013 and December 27, 2013.  These payments originated from an account associated with Evans at a bank in Cyprus and were transmitted to Company A's bank account in the United States.

28.     In addition, a second suspected front company from Belize wired $1,700,000 to Company A via four transactions occurring between December 5, 2013 and January 4, 2014. These funds were wired as partial payments for the eight engines.  These payments originated from a bank account in Latvia associated with this suspected front company and were transmitted to Company A's bank account in the United States.

29.     Finally, a third suspected front company in the United Kingdom made one wire transfer of $270,000 on December 27, 2013 to Company A for the eight Evans' engines. This payment originated from an account in Estonia associated with this suspected front company and was transmitted to Company A's bank account in the United States.

30.     Company A believed that these three entities (Evans, the Belize company, and the U.K. company) were related, given that these front companies coordinated payments into the United States as part of the scheme by Evans to purchase the eight engines.

**D.     Evans Is Added to TDO**

31.     On January 3, 2014, OEE learned of the impending transfer of the defendant properties by Pouya Air to Iran, via 3K.  OEE later learned that this transfer was being directed by Evans.

32.     On January 30, 2014, BIS issued an amended TDO naming Evans as a Denied Party.  Evans is believed to be owned, managed, affiliated or controlled by persons or entities in Russia.

33.     Aside from the two defendant properties, OEE subsequently detained three other engines from the eight engines purchased by Evans from Company A.  The remaining three engines could not be detained, as they had already been exported.

**E.     3K and Pouya**

34.     3K is a freight forwarder and logistics company owned by Huseyin Engin Borluca, and is located in Antalya, Turkey.  3K was the forwarding agent for the defendant properties and, upon information and belief, currently maintains the defendant properties at its premises.

35.     3K's Facebook page contained a number of photographs dated December 27, 2012 of 3K personnel in, on, or near a Pouya Air IL-76 cargo aircraft marked with the letters EP-PUS.  3K's comments associated with these photos indicated that the aircraft was parked on the cargo area of Antalya Airport in Turkey.  The caption to the photos stated: "IL 76 Engine Loading" and other photographs appear to show Borluca and other 3K employees standing next

to two shrouded aircraft engines that are packaged in a manner consistent with export. Markings

on the chassis holding one of the engines indicate that the engine is likely a U.S.-origin product.

Subsequent to the issuance of the TDO, these photographs were deleted from 3K's Facebook

page.

      36.     Pouya is an Iranian air cargo company located in Tehran, Iran.  According to

publicly available aircraft registries, Pouya has six Russian manufactured aircraft, including

three Illyushin IL-76 cargo aircraft which bear Iranian registrations EP-PUS, EP-PUO, and EP-

PUL.  On August 29, 2014, Pouya Air was identified by OFAC as an alias for the previously

designated Iranian airline, Yas Air.

      37.     Yas Air was designated by OFAC in March 2012 pursuant to Executive Order

13224 for acting for or on behalf of the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-

QF").[1]  The IRGC-QF is the paramilitary organization that reports directly to the Supreme

Ayatollah for the Islamic Republic of Iran and conducts terrorist operations on Iran's behalf.

Additionally, IRGC-QF supports Hizballah, a designated Foreign Terrorist Organization.

According to OFAC, Pouya and Yas Air have transported illicit cargo, including weapons, to

Iranian supported regimes and terrorist groups.

    **F.**     **Post-TDO Obfuscation**

      38.     Subsequent to the issuance of the TDO, the Turkish intermediary inspected a

series of documents purporting to show the sale of the defendant properties from the Turkish

intermediary directly to 3K.  These documents were determined to be forgeries.  3K never

---

[1] The applicable OFAC blocking authorities are enumerated in Executive Order 13224 of
September 23, 2001 ("Blocking Property and Prohibiting Transactions With Persons Who
Commit, Threaten to Commit, or Support Terrorism"), the International Emergency Economic
Powers Act, ("IEEPA"), 50 U.S.C. §1701 et seq., and the Global Terrorism Sanctions
Regulations, 31 C.F.R. Part 594.

entered into any contract to purchase the defendant properties, but was merely the forwarding agent engaged by Evans.

39.     The documents lacked the customary stamps and signatures required on normal shipping documents, which indicated that they were deliberately forged.  If these documents were presented to customs authorities, they would have been rejected as insufficient.  This would have presented an opportunity to divert the defendant properties to Iran and obscure the true nature, beneficiary, and purpose of the transaction.

## COUNT ONE

40.     All statements and averments made in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

41.     As described above, the defendant properties constitute or are derived from proceeds traceable to a violation of the IEEPA, specifically 50 U.S.C. § 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the EAR and ITSR.

42.     By reason of the above-described facts, the defendant properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO

43.     All statements and averments made in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

44.     Persons in Russia, Turkey, Iran, Estonia, Latvia, Belize, BVI, Cyprus, the United Kingdom, and elsewhere, conspired to transmit and transfer payments for the defendant properties to a place inside the United States from or through a place outside the United States,

with the intent to promote the carrying on of violations of the IEEPA, EAR, and 18 U.S.C. § 554, in violation of 18 U.S.C. § 1956(h) and (a)(2)(A).

45.     By reason of the above-described facts, the defendant properties are subject to forfeiture to the United States, pursuant to  18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(h), or as any property traceable to such property.

## COUNT THREE

46.     All statements and averments made in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

47.     Persons in Russia, Turkey, Iran, and elsewhere, conspired to attempt to export, re-export, transfer or ship from the United States articles, namely the defendant properties, in violation of law, namely the IEEPA and EAR, all in violation of 22 U.S.C. § 401(a).

48.     As such, the defendant properties are subject to forfeiture to the United States, pursuant to 22 U.S.C. § 401(a).

## CONCLUSION

**WHEREFORE**, the United States of America prays that a warrant for arrest *in rem* and notice issue on the defendant property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

/s/ Ronald C. Machen Jr
RONALD C. MACHEN JR.,
D.C. Bar No. 447889
United States Attorney

/s/ Zia M. Faruqui
Zia M. Faruqui,
D.C. Bar No. 494990
Assistant United States Attorney
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20530
zia.faruqui@usdoj.gov
(202) 252-7117

/s/ Christopher B. Brown
Christopher B. Brown,
D.C. Bar No. 1008763
Assistant United States Attorney
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20530
christopher.brown6@usdoj.gov
(202) 252-7153

## VERIFICATION

I, COLIN A. MAY, a Special Agent with the OEE, United States Department of

Commerce, Bureau of Industry and Security, declare under penalty of perjury, pursuant to 28

U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon

reports and information known to me and/or furnished to me by other law enforcement agents

and that everything represented herein is true and correct.


Executed on this ____30th__ day of December 2014.


*/s/ Colin May*_____
COLIN A. MAY
Special Agent
Office of Export Enforcement

## VERIFICATION

I, COLIN A. MAY, a Special Agent with the OEE, United States Department of Commerce, Bureau of Industry and Security, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct.

Executed on this _____30th___ day of December 2014.


_/s/ Colin May_
COLIN A. MAY
Special Agent
Office of Export Enforcement